In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 15-3375

NANCY J. PINNO,

*Petitioner-Appellant,*

*v.*

PATTI WACHTENDORF, Warden,

*Respondent-Appellee.*

———————————

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 15 CV 296 — **William C. Griesbach**, *Chief Judge.*

———————————

No. 15-3495

TRAVIS SEATON,

*Petitioner-Appellant,*

*v.*

JUDY P. SMITH, Warden,

*Respondent-Appellee.*

———————————

Appeal from the United States District Court for the
Eastern District of Wisconsin.

No. 14 CV 945 — **William C. Griesbach**, *Chief Judge.*

———————————

ARGUED NOVEMBER 29, 2016 — DECIDED JANUARY 5, 2017

———————————

Before POSNER, EASTERBROOK, and SYKES, *Circuit Judges.*

POSNER, *Circuit Judge.* In *Presley v. Georgia*, 558 U.S. 209 (2010), the Supreme Court held that the right of a criminal defendant to a public trial, a right conferred by the Sixth Amendment, extends to the voir dire. *Id.* at 213–14. In the present case both petitioner-appellants argue that this right was violated by the decision of the state trial judge (the same judge in both cases) to forbid members of the public to attend the voir dire phase of the petitioners' trials in a Wisconsin state court that ended in their being convicted.

After the Wisconsin Supreme Court, rejecting the petitioners' Sixth Amendment argument, affirmed their convictions and sentences, they asked the local federal district court for habeas corpus. Both argued that they were entitled to a new trial because their Sixth Amendment rights had been violated. The district judge (the same judge in both habeas corpus proceedings) rejected their claims, awarding judgment for the respondents, who are the wardens of the prisons in which the petitioners are serving the sentences imposed on them by the state judiciary.

Pinno had been convicted of assisting in the mutilation of a corpse and interference with police. She had assisted her son in secretly disposing of the body of his girlfriend, whom the son had murdered a few weeks earlier. Pinno's assistance consisted of transporting the corpse in her car to a

friend's house, where her son and a friend of hers burned the body. They then drilled a hole in the ice on a nearby lake and dumped the ashes through the hole, making it impossible for the police to recover any of the body of the murdered woman. For these offenses Pinno was sentenced to eight and a quarter years in prison to be followed by five years of supervised release.

But that gets us ahead of our story, which is focused on the trial, indeed the earliest stage of the trial. The trial judge called for a very large jury pool—a pool of more than 80 prospective jurors. He wanted to assure that enough seats were available for all the prospective jurors to be seated, and he also wanted to prevent members of the public, who would be seated in the audience section of the courtroom, from influencing the jury by remarks or facial expressions. He considered those to be dangers because the case, with its gruesome and bizarre facts, had attracted a great deal of publicity.

So before the prospective jurors entered the courtroom the judge ordered the spectators to leave, and the door to the courtroom to be locked until all the prospective jurors were seated. After they were seated the door was unlocked and members of the public were able to enter, though it's unclear how many entered, or could enter since the courtroom was crowded with prospective jurors and the judge had announced beforehand that he "want[ed] no one else in here during the entire voir dire process until the jury is selected." Despite that admonition, since the door to the courtroom was open during the voir dire some members of the public—how many we don't know—may have entered, and stayed to observe the voir dire.

An alternative way of handling the crowded-conditions problem would have been to accommodate the members of the public in a different room in the courthouse, where they could watch the trial on a television screen. But no one suggested doing that; nor have we been told whether a suitable room and the necessary equipment existed.

We also don't know how many, if any, members of the public were in the courtroom during the voir dire. But we'll give Pinno the benefit of the doubt and assume there were too few to make the voir dire public within the meaning of the Sixth Amendment's public-trial right. Members of the public, most importantly friends, family, or other actual or potential supporters of a defendant, may be able from observing the voir dire to learn things that may help the defense—learn for example that members of the jury panel who end up being selected for the jury are visibly hostile to the defendant, glare at her, yawn and doze, or that the questions asked the prospective jurors by the judge or the prosecutor seem to invite them to regard the defendant as an evil, criminal person. These insights absorbed by the friends of the accused may help to strengthen her defense. Conceivably the presence of a defendant's supporters may also deter any impropriety by the prosecutors or judge, but this seems unlikely because the prosecutors and judge probably wouldn't know whether or which members of the audience were aligned with the defendant.

But the problem for Pinno is that her lawyers did not object to the public's limited access to the trial at the voir dire stage. Pinno calls that ineffective assistance of counsel, a separate ground for a new trial. But it cannot be presumed, and has not been shown in Pinno's case, that the failure of a

defendant's lawyers to insist on ample seating space for the public during voir dire evidenced ineffective assistance prejudicial to the client. It may have been neither ineffective nor prejudicial, for it might well be in the *defendant's* interest *not* to have members of the public, as distinct from family members, friends, and other supporters, present for the voir dire. A trial may attract members of the public because they're hostile to rather than supportive of the defendant. That might have been a serious problem for Pinno, given the grotesque character of her crime.

The experience of the defendant in our other case, Seaton, was virtually identical to Pinno's, though he was convicted of a different and even more serious crime—first-degree reckless homicide: he had punched a person, and the person had died later that day as a result of the injury caused by the punch and the victim's resulting fall to the ground. Though Seaton's crime was less grotesque than Pinno's, it was homicide and would hardly have endeared him to the members of the public who attended the trial. Indeed, whereas he had killed a person, Pinno had merely assisted in the destruction of a corpse.

Whether the petitioners benefited or were harmed by the exclusion of spectators from the voir dire phase of the trial, their lawyers forfeited their clients' right to an audience by failing to object to the judge's ruling excluding the audience in whole or part. So the Wisconsin Supreme Court determined, and we are obliged to defer to that determination because it did not result in a decision that was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or that was "based on an unreasonable de-

termination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

The petitioners' current lawyers, however, argue that lawyers can't forfeit a client's Sixth Amendment's right to a public trial (including a public voir dire stage of the trial); the right can only be waived—that is, there must be an affirmative statement either by the defendants themselves or by their lawyers acting under instruction from the clients that they do not want members of the public to be present in the courtroom, whether during just the voir dire or at other stages of the trial as well. To waive the right the clients would have to tell their lawyers to tell the judge that their clients were waiving in whole or part their public-trial right. But in the two cases before us the clients evidently agreed with their lawyers not to seek the admission of an audience during the voir dire stage. Nor is such agreement surprising, for as we said it's entirely plausible that a criminal defendant will be hurt rather than helped by having the public present at *any* stage of his or her trial.

The petitioners cite our opinion in *Walton v. Briley*, 361 F.3d 431, 433 (7th Cir. 2004), where we said that a failure by the defendant's (Walton's) lawyer to object to barring the public from attending the trial did not constitute a waiver by Walton of his Sixth Amendment right to a public trial. But that can't save the petitioners in the present case. For section 2254(d) authorizes a federal court to grant a state prisoner's habeas corpus petition only if the state court's decision of which the prisoner is complaining was contrary to U.S. Supreme Court precedent; it is not enough that the state court's decision is contrary to one of our decisions.

*Walton*, moreover, was a special case; and judicial opinions must be interpreted in context. In an effort to expedite Walton's trial the trial judge had conducted the first two trial sessions, at which most of the prosecution's evidence was presented (so they were critical stages of the trial), late in the evening—so late that the courthouse was locked. The consequence was that members of the public, among them Walton's fiancée, were barred from attending the sessions. The judge had made up his mind about an audience in the courtroom: there wasn't going to be one, and so an objection to the judge's decision wasn't going to do Walton any good in his trial. And thus his Sixth Amendment right had been violated.

Neither of the present cases is like *Waller v. Georgia*, 467 U.S. 39, 48 (1984), either, where the prosecutor asked for exclusion of the public from a portion of the trial proceedings and the defendant's counsel objected. There is no evidence in either case before us that *anyone* objected to the initial exclusion of the public from the courtroom to enable the entire jury panel to be seated. Given the number of prospective jurors to be seated the trial judge may have had no option but to exclude the public until all the panel members were seated. Maybe he didn't need so many prospective jurors for the voir dire, but that is not argued.

And so the judgments of the district court in these two cases must be affirmed. But we do wish to comment briefly on the length of the parties' briefs. They total 250 pages, of which 31 pages consist of the district judge's opinion (one opinion for the two cases). The other 219 pages are the parties' arguments. There is no justification for such verbosity. These two consolidated cases are simple and straightfor-

ward. Our opinion is only seven pages long; and while such compression is not to be expected of the parties, they should have needed, and used, no more than 100 pages at the most to present their claims fully.

AFFIRMED